UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| WILLIAM CODY,<br><br>                    Plaintiff,<br><br>        vs.<br><br>RN HEATHER BOWERS; LINDA MILLER-HUNOFF; RN JESSICA SCHREURS; KRISTINE WIERSMA; RN KAYLA TINKER; DR. MARY CARPENTER; STEVE BAKER; ARTHUR ALLCOCK; JENNIFER DRIESKE; DARIN YOUNG; DENNIS KAEMINGK; DR. KENRA OTT; RD JESSICA BECKER;  MERLIN SEJNOHA JR.; TROY PONTO; DERRICK BIEBER; ELIZABETH EFFLING; CO GAIKOWSKI; BRENT MCDONALD, ALL PRECEEDING DEFENDANTS IN THEIR OFFICIAL OR INDIVIDUAL CAPACITIES; AND CBM MANAGED SERVICES;<br><br>                    Defendants. | 4:19-CV-04026-RAL<br><br><br><br>REPORT AND RECOMMENDATION ON SCREENING PURSUANT TO 28 U.S.C. § 1915 |

**INTRODUCTION**

This matter is before the court on plaintiff William Cody's *pro se* amended complaint pursuant to 42 U.S.C. § 1983.  See Docket No. 9. Mr. Cody is currently serving a life sentence at the South Dakota State Penitentiary ("SDSP") and is seeking to assert various claims based on prison conditions at the SDSP.  Id.  In this opinion, the court screens Mr. Cody's amended complaint pursuant to 28 U.S.C. § 1915.

## FACTS

Mr. Cody's amended complaint is an olio of facts and claims, some completely unrelated to each other.  In general, his claims can be grouped into the following subject areas:  medical treatment, diet, interference with mail, and retaliation.  For each general fact pattern Mr. Cody--with few exceptions-- asserts multiple legal claims.  Rather than discuss the facts in detail twice, the court sets forth the facts in the discussion section below, with the exception of Mr. Cody's equal protection claim.

## DISCUSSION

### A.    Rule 12(b)(6) and 28 U.S.C. § 1915 Screening Standards.

Pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1), a prisoner's complaint should be dismissed on screening if it "fails to state a claim upon which relief may be granted."  This standard is the same standard as is used to determine whether a complaint satisfies the standards of FED. R. CIV. P. 12(b)(6).  Kane v. Lancaster County Dept. of Corrections, 960 F.Supp. 219 (D. Neb. 1997).  "In evaluating whether a pro se plaintiff has asserted sufficient facts to state a claim, we hold 'a *pro se* complaint, however inartfully pleaded, . . . to less stringent standards than formal pleadings drafted by lawyers.' " Jackson v. Nixon, 747 F.3d 537, 541 (8th Cir. 2014) (quoting Erickson v. Pardus, 551 U.S. 89, 94 (2007) (*per curiam*)).  "When we say that a pro se complaint should be given liberal construction, we mean that if the essence of an allegation is discernible, even though it is not pleaded with legal nicety, then the district court should construe the complaint in a way that permits the

layperson's claim to be considered within the proper framework." Id. at 544 (quoting Stone v. Harry, 364 F.3d 912, 915 (8th Cir. 2004)).

The United States Supreme Court addressed the standard that district courts are to apply to Rule 12(b)(6) motions in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009).

The law predating Twombly and Iqbal held that under Rule 12(b)(6), the court should not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove *no set of facts* in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957) (emphasis added). However, Conley's "no set of facts" language was overruled in Twombly. Twombly, 550 U.S. at 563. Instead, the Court adopted a standard by which plaintiffs must plead "enough facts to state a claim to relief that is *plausible* on its face." Id. at 570 (emphasis added).

Under Federal Rule of Civil Procedure 8(a)(2), a plaintiff must plead only "a short and plain statement of the claim showing that the pleader is entitled to relief." Id. at 554-55 (quoting FED. R. CIV. P. 8(a)(2)). A complaint does not need "detailed factual allegations" to survive a motion to dismiss, but a plaintiff must provide the grounds for his entitlement to relief and cannot merely recite the elements of his cause of action. Id. at 555 (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). The Court also imposed a "plausibility standard," holding that a claim "requires a complaint with enough factual matter (taken as true)" to support the conclusion that the plaintiff has a valid claim. Id. at 556. The plaintiff's complaint must contain sufficiently specific factual

3

allegations in order to cross the line between "possibility" and "plausibility" of entitlement to relief.  Id.

There are two "working principles" from Twombly and Iqbal.  Iqbal, 556 U.S. at 678.  First, courts are not required to accept as true legal conclusions "couched as factual allegation[s]" contained in a complaint.  Id. (citing Papasan, 478 U.S. at 286).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. (quoting Twombly, 550 U.S. at 555).  Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  Iqbal, 556 U.S. at 678-79.

Second, the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id. at 679 (quoting decision below Iqbal v. Hasty, 490 F.3d 143, 157-158 (2d Cir. 2007)).  Where the plaintiff's allegations are merely conclusory, the court may not infer more than the mere possibility of misconduct, and the complaint has alleged--but has not "show[n]"--that he is entitled to relief as required by Rule 8(a)(2).  Iqbal, 556 U.S. at 679 (emphasis added).

The Court explained that a reviewing court should begin by identifying statements in the complaint that are conclusory and therefore not entitled to the presumption of truth.  Id. at 679-680.  Legal conclusions must be supported by factual allegations demonstrating the grounds for a plaintiff's entitlement to relief.  Id. at 679; Twombly, 550 U.S. at 555; FED. R. CIV. P. 8(a)(2).  A court should assume the truth only of "well-pleaded factual

4

allegations," and then may proceed to determine whether the allegations "plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679. It is through the lens of Twombly and Iqbal that the court examines the sufficiency of Mr. Cody's amended complaint to determine whether it survives screening pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

**B.    Equal Protection**

Mr. Cody asserts his right to equal protection under the constitution has been violated in association with multiple fact patterns and claims. See Docket No. 9 at pp. 62-65, 67-68 (Claims 1-2, 6, 9-10). The equal protection clause requires the government to "treat similarly situated people alike," a protection that applies to prisoners. Murphy v. Missouri Dept. of Corrections, 372 F.3d 979, 984 (8th Cir. 2004). To plead an equal protection violation, Mr. Cody must plead facts demonstrating: (1) he is treated differently than a similarly situated class of inmates, (2) the different treatment burdens a fundamental right, and (3) there is no rational relation to any legitimate penal interest. Id. (citing Rouse v. Benson, 193 F.3d 936, 942 (8th Cir. 1999) (citing City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985))).

The first step in an equal protection case is determining whether the plaintiff has demonstrated different treatment than others similarly situated to him. Murphy, 372 F.3d at 984. Mr. Cody must identify the characteristics of the class he claims to be similarly situated to and allege facts showing that other groups within the class were not also restricted in similar ways. Without such allegations, an equal protection claim has not been asserted. Id.

5

In <u>Patel v. U.S. Bureau of Prisons</u>, 515 F.3d 807, 815-16 (8th Cir. 2008), the Eighth Circuit explained for a prisoner to prevail on an equal protection claim, he "must show that he is treated differently from similarly situated inmates and that the different treatment is based upon either a suspect classification or a fundamental right." <u>Id.</u>  If an equal protection claim is not based on a "suspect class" or a fundamental right, it is subject to a rational basis review.  <u>Gilmore v. County of Douglas, State of Nebraska</u>, 406 F.3d 935, 937 (8th Cir. 2005) (citations omitted).  The rational basis review is "the paradigm of judicial restraint.  Congress does not violate the right to equal protection merely because the classifications made by its laws are imperfect, or because in practice a classification results in some inequality." <u>Minnesota Senior Federation, Metropolitan Region v. United States</u>, 273 F.3d 805, 808 (8th Cir. 2001) (citations omitted, punctuation altered).

The United States Supreme Court has explained the rational basis review in an equal protection analysis

> . . . is not a license for courts to judge the wisdom, fairness or logic of legislative choices.  Nor does it authorize the judiciary to sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.  For these reasons, a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity.  Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.  Further, a legislature that creates these categories need not actually articulate at any time the purpose or rationale supporting its classification.  Instead, a classification must be upheld against an equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.

A state, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification.  A legislative choice is not subject to courtroom factfinding and may be based on a rational speculation unsupported by evidence or empirical data.  A statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record.  Finally, courts are compelled under rational basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends.  A classification does not fail rational basis review because it is not made with mathematical nicety or because in practice it results in some inequality . . .

Heller v. Doe, 509 U.S. 312, 319-320 (1993) (citations omitted, punctuation altered).

Finally, "[n]either prisoners nor indigents constitute a suspect class . . ." Murray v. Dosal, 150 F.3d 814, 818 (8th Cir. 1998).  And "[t]he United States Supreme Court has defined fundamental rights as those rights that are 'deeply rooted in this nation's history and tradition.' " Johnson v. University of Iowa, 431 F.3d 325, 331 (8th Cir. 2005) (citing Moore v. City of East Cleveland, 431 U.S. 494, 503 (1977)).  Classifications based upon sex, race, alienage, and national origin are suspect classifications.  Frontiero v. Richardson, 411 U.S. 677, 682 (1973).  Religion is also a suspect classification.  Patel, 515 F.3d at 815-16.

All of Mr. Cody's equal protection claims fail to state a claim.  He never alleges defendants' actions against him are motivated by race, sex, alienage, national origin or religion.  He also fails to allege that he is treated differently than any other similarly-situated class.  This court recommends dismissing each of Mr. Cody's equal protection claims as asserted in claims 1-2, 6, 9-10.

7

**C.    Claims 1-2 & 8—Seizure of Mail**

Mr. Cody asserts defendants seize mail addressed to him by outside-the-prison medical providers without providing notice to either Mr. Cody or the sender.  He alleges this violates his First Amendment right to receive mail.  In addition, because the mail is relevant to his medical conditions and treatment, he claims defendants' actions impact his medical care, thus violating his right under the Eighth Amendment to be free from cruel and unusual punishment.  Also, because defendants' actions allegedly deprive him of evidence needed to assert an Eighth Amendment claim, Mr. Cody asserts defendants' actions deny him access to the courts.  Finally, he claims defendants' actions violate his right to procedural due process because he is not given notice of the seizure of his mail and an opportunity to be heard.

This very subject was the centerpiece of a 2014 lawsuit Mr. Cody filed with this court.  See Cody v. McDonald, 4:14-cv-04026-RAL (D.S.D.).[1]  The 2014 case was dismissed in large part because defendants asserted in summary judgment motions that they had formulated a procedure through which defendants' concerns about safety were addressed and Mr. Cody's concerns about receiving medical mail from outside providers was also met.  Id. at Docket Nos. 115 & 116.  Specifically, defendants argued in the 2014 case they did not want letters from outside medical providers to be delivered directly to inmates in case the letters included reference to the date of a future medical

_____

[1] In fact, by this court's count, Mr. Cody has filed 24 separate lawsuits with this court since 1979.  The instant case and the 2014 case are but two.

8

appointment.  Advance knowledge of when an inmate would be transported to an outside medical provider was asserted by defendants to pose a security risk. Accordingly, defendants proposed having Mr. Cody first notify them that he had requested a medical record from an outside medical provider.  Defendants then would look for that record to arrive, medical personnel would open and read the record from the outside medical provider first to ensure no future medical appointments were referenced therein.  Then defendants would provide the letter to Mr. Cody with any future appointments redacted from the record.

Mr. Cody is not merely replowing the same field in this lawsuit.  Instead, he asserts defendants are not following the policy they told the court they would follow in the 2014 case.  Because Mr. Cody gives extensive background in his amended complaint going back to 2013, the court points out that the statute of limitations for a § 1983 claim is three years.  See SDCL § 15-2-15.2; Wilson v. Garcia, 471 U.S. 261, 266-67 (1985).[2]  Thus, the court considers each legal theory espoused by Mr. Cody in connection with his factual

---

[2] Wilson was partially superseded by passage of a four-year "catch-all" statute of limitations for federal actions.  See 28 U.S.C. § 1658, as recognized in Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 377-81 (2004).  If a plaintiff's claim "arises under" a federal statute that was enacted by Congress after 1990, then a four-year statute of limitations applies.  See 28 U.S.C. § 1658.  Although § 1983 was amended after 1990 (in 1996), those amendments have to do with immunity for judicial officers from injunctive relief.  See 42 U.S.C. § 1983. Thus, actions such as Mr. Cody's claim do not "arise under" the 1996 amendments because none of his named defendants are judicial officers.  See Williams v. Hawkeye Community College, 494 F. Supp. 2d 1032, 1038 (N.D. Iowa 2007).  Accordingly, Wilson continues to control the analysis.  DeVries v. Driesen, 766 F.3d 922, 923-24 (8th Cir. 2014); Williams, 494 F. Supp. 2d at 1038.

allegations that defendants are interfering with his receipt of mail—but only those actions by defendants which occurred in the three years prior to the filing of Mr. Cody's complaint on February 5, 2019.

### 1.    First Amendment Interference with Mail

One of the subclaims asserted by Mr. Cody is interference with mail, which the court interprets to invoke the First Amendment.  This claim is governed by the analysis in Turner v. Safley, 482 U.S. 78 (1987).[3]  The Turner reasonableness standard requires the court to evaluate several factors:

1.    whether the governmental objective underlying the regulations is legitimate and neutral;

2.    whether the regulation is rationally related to that governmental objective;

3.    whether there are alternative means of exercising the right that remain open to prisoners;

4.    what impact the accommodation of the plaintiff's asserted constitutional right will have on others (guards and inmates) inside the prison; and

5.    whether there are obvious, easy alternatives whose existence show that the regulation in question is not reasonable, but is an "exaggerated response" to prison concerns.

See Thornburg v. Abbott, 490 U.S. 401, 414-19 (1989).

---

[3] The portion of the Turner decision—not applicable here—dealing with prison regulation of inmate marriages was legislatively impacted by the passage of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc, et seq.  After passage of RLUIPA, constitutional claims premised on the First Amendment free exercise of religion clause continue to be governed by the Turner standard, however claimants can now bring a claim under RLUIPA, which imposes a stricter standard on prison regulations affecting religion.  See Gladson v. Iowa Dept. of Corrections, 551 F.3d 825, 831-32 (8th Cir. 2009).

First Amendment concerns are implicated—both for the inmates and the persons sending mail to the inmates—by prison officials' interference with inmates' incoming mail, but such rights "must be exercised with due regard for the 'inordinately difficult undertaking' that is modern prison administration." Thornburgh, 490 U.S. at 407 (quoting Turner, 482 U.S. at 85). Persons on the "outside" have an interest in access to those on the "inside" of prisons, but certain interactions, though "seemingly innocuous to laymen," may pose "potentially significant implications for the order and security of the prison." Id. Because of the "difficult and delicate problems of prison management," "considerable deference" is afforded prison regulations. Id. at 407-08.

Several of the Turner factors require the defendants' input: what is their justification for withholding mail from outside medical providers? Is the justification the same as when Mr. Cody brought his 2014 lawsuit? If so, why have defendants not followed the policy they previously devised to address Mr. Cody's First Amendment concerns with receiving outside mail? On this record, and without defendants' input, the court cannot conclude that Mr. Cody fails to state a claim. Accordingly, the court recommends the interference with mail subclaims in Claims 1, 2, and 8 be allowed to pass screening.

### 2. Due Process

Mr. Cody asserts his procedural due process rights were violated when defendants seized his mail from outside medical providers without providing notice to him or to the sender. In Knight v. Lombardi, 952 F.2d 177, 179 (8th

11

Cir. 1991), the court analyzed an inmate's procedural due process claim stemming from seizure of his mail without notice. Although the <u>Knight</u> court did state that the failure to give notice promptly at the time mail is seized is "arguably a procedural due process violation," the court rejected Knight's claim and said it should have been dismissed without ever being served on defendants because Knight could show no injury flowing from the alleged violation. <u>Knight</u>, 952 F.2d at 179.

The court rejected Knight's claim because his ability to submit grievances to protest the seizure of his mail was not compromised in that case. <u>Knight</u>, 952 F.2d at 179. The same is true here for Mr. Cody: the record shows Mr. Cody himself alleges he learned of defendants' "seizure" of his mail and filed numerous grievances about the seizure itself and the underlying policy. In addition, like the inmate in <u>Knight</u>, Mr. Cody here alleges no injury that flowed from the alleged interference with mail. Although he conjures up the specter of *possible* harm (wrong prescriptions being relayed to outside providers, the possibility indicia for leukemia may be overlooked, etc.), Mr. Cody does not allege any *actual* harm has come to pass. For the same reasons relied upon by the <u>Knight</u> court in screening out Knight's due process claim under § 1915, this court similarly recommends dismissing the due process subclaim from Mr. Cody's Claims 1 and 2.

### 3.    Access to the Courts

Prisoners have a constitutional right of access to the courts. <u>Bounds v. Smith</u>, 430 U.S. 817, 821 (1977), <u>overruled in part by</u> <u>Lewis v. Casey</u>, 518 U.S.

343, 354 (1996).[4]  This includes the right by prisoners to pursue direct appeals of their convictions, to seek habeas relief, and to file civil rights actions.  Id. at 821-23.  This right imposes an obligation on prison authorities to provide indigent inmates with paper and pen to draft legal documents, notary services, and stamps to mail court documents.  Id. at 824-25.  Prisoners, no less than lawyers, must also "know what the law is in order to determine whether a colorable claim exists, and if so, what facts are necessary to state a cause of action."  Id. at 825.  Thus, the right of access to the courts may be protected where prison officials either provide prisoners with adequate law libraries, or provide them with assistance from persons trained in the law—although other methods might also pass constitutional muster.  Id. at 828.  See also Lewis, 518 U.S. at 351.

A prisoner asserting a claim of violation of his or her right of access to the courts must establish an "actual injury" in order to prevail on a § 1983 claim premised on that right.  Lewis, 518 U.S. at 351-52; Moore v. Plaster, 266 F.3d 928, 933 (8th Cir. 2001) (citing Klinger v. Dept. of Corrections, 107 F.3d 609, 617 (8th Cir. 1997)).  "Actual injury" means "that a nonfrivolous legal claim had been frustrated or was being impeded" by defendants' failure to maintain an adequate law library or to provide adequate legal assistance. Lewis, 518 U.S. at 352-53; Moore, 266 F.3d at 933 (quoting Johnson v. Missouri, 142 F.3d 1087, 1089 (8th Cir. 1998)).

---

[4] The Lewis Court overruled statements in Bounds that suggested that the right of access to the courts required states to enable prisoners to *discover* grievances and to *litigate effectively* once in court.  Lewis, 518 U.S. at 354.

Mr. Cody asserts defendants' interference with his mail has denied him access to the courts, but he never identifies an "actual injury"—he articulates no nonfrivolous lawsuit that was frustrated or impeded by defendants' alleged seizure of his mail from outside medical providers. This failure to articulate an actual injury is fatal to Mr. Cody's access to the courts claim in regard to Claims 1 and 2. Accordingly, this court recommends that portion of Claims 1 and 2 be dismissed.

### 4.    Deliberate Indifference

The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment. Allard v. Baldwin, 779 F.3d 768, 771 (8th Cir. 2015). That prohibition includes prison officials' deliberate indifference to the medical needs of inmates. Id. That is because "deliberate indifference to serious medical needs of prisoners constitutes 'the unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Id. at 104-05.

"[T]his does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Id. at 105. "[A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical

14

needs." Id. at 106. Allegations of negligence are not enough to state a claim. Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000) (prisoner must show more than gross negligence and more than disagreement with treatment decisions).

Deliberate indifference requires the court to make both an objective and a subjective evaluation. Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing Coleman v. Rahja, 114 F.3d 778, 784 (8th Cir. 1997)). Mr. Cody is required to allege facts showing (1) that he suffered objectively serious medical needs and (2) that defendants actually knew of but deliberately disregarded those needs. Id. (citing Coleman, 114 F.3d at 784). "A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Coleman, 114 F.3d at 784.

To establish liability, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). A plaintiff asserting deliberate indifference "must show more than even gross negligence"—he "must establish a 'mental state akin to criminal recklessness: disregarding a known risk to the inmate's health.'" Allard, 779 F.3d at 771-72.

A plaintiff can show deliberate indifference by demonstrating grossly incompetent or inadequate care; showing a defendant's decision to make a less

efficacious and easier course of treatment; or demonstrating that a defendant denied access to or intentionally delayed medical care. Id. at 772.

Presumably, by asserting a deliberate indifference claim in association with defendants' interference with medical mail, Mr. Cody is asserting that defendants may cause Mr. Cody harm. For example, he notes his father died of leukemia. He then suggests that if he is unable to review outside medical reports he may miss some medical indication that he is also developing leukemia. Also, Mr. Cody asserts defendants have, at times, misstated to outside medical providers the medications Mr. Cody is taking. Mr. Cody suggests that if he is unable to obtain outside providers' records, these misstatements may cause harm to him. However, none of these projected harms has actually materialized. Mr. Cody's deliberate indifference claim fails because he cannot show he has been harmed. He clearly has serious medical needs (as discussed in more detail below), but he cannot show defendants have been deliberately indifferent to those needs by seizing his mail. Again, although Mr. Cody mentions several bad things that *might* happen if he is unable to review his medical correspondence, none of those conjectured possibilities has happened. The court recommends dismissing on screening that portion of Claims 1 and 2 that allege an Eighth Amendment deliberate indifference claim.

**D.    Claims 3-6—Medical Care**

Mr. Cody alleges defendants have denied him hearing aids he needs, adequate eye care, and a diet with sufficient iron content to ward off anemia.

16

In addition, he alleges defendants instituted a policy that requires him to purchase certain over the counter ("OTC") medications from the commissary with his own money.   As to each of these factual circumstances, he alleges defendants have violated his rights under the Eighth Amendment to be free from cruel and unusual punishment.  As to the allegedly inadequate eye care, he also alleges denial of access to the courts.  As to the OTC policy, Mr. Cody also alleges his rights to due process have been violated.

### 1.    Deliberate Indifference

#### a.    hearing aids

The same standard described above for deliberate indifference applies to these claims.  Mr. Cody alleges he has been complaining about loss of hearing to prison health authorities since 2011, but it was not until 2016 that his hearing was tested by an outside audiologist, Dr. Lindsey Koch.  Dr. Koch documented that Mr. Cody had suffered a loss of hearing in the mid- and high-pitches which affected clarity of speech.  Dr. Koch recommended Mr. Cody would benefit from amplification.  Shortly after Dr. Koch's testing, Mr. Cody alleges defendant Schreurs notified him that the audiology test results did not meet the South Dakota Department of Health's ("DOH") criteria for hearing aids for inmates and, therefore, Mr. Cody would not be provided with hearing aids. Another subsequent request by Mr. Cody for hearing aids was also turned down.

Then, in 2018, Mr. Cody alleges Dr. Koch issued a report of hearing tests performed on Mr. Cody indicating that he did not meet the requirements

17

established by DOH for hearing aids for inmates.  Mr. Cody alleges Dr. Koch changed her opinion due to a conflict of interest—she does significant business with the SDSP that she wants to continue to receive that business rather than issue reports consistent with her patients' health.

Mr. Cody's claim is based on the medical care he has received (or, in this case, did not receive), but his claim is also based on an allegation the policy itself establishing the parameters for inmates to receive hearing aids is unconstitutional.  Mr. Cody alleges the DOH policy does not take into account the unique need for acute hearing in the prison environment.  Mr. Cody alleges the prison environment itself is extremely noisy.  In addition, he alleges inmates need acute hearing in order to apprehend when a dangerous situation is nearby and to respond to announcements broadcast over the prison public address system.  Mr. Cody alleges he has suffered disciplinary measures directed against him because he was not able to hear sufficiently well to respond to orders and instructions given by prison staff.  Mr. Cody has alleged sufficient facts to plausibly show a serious medical condition and that defendants were deliberately indifferent to that need.  The Eighth Amendment hearing aid claim passes screening.

### b.    eye care

With regard to eye care, Mr. Cody alleges defendant Dr. Kendra Ott, an optometrist who provides eye care to inmates via a contract with the DOH,

examined him on June 13, 2013[5], after Mr. Cody complained of rapidly
deteriorating eyesight and painful irritation in both eyes.  Dr. Ott diagnosed
severe dry eyes due to an infection and prescribed OTC artificial tears and the
prescription eye drops Restasis.  Apparently, Mr. Cody never received the
prescription eye drops and filed a grievance regarding that.  Mr. Cody was
informed that defendant Dr. Mary Carpenter, head of the DOH, had denied the
prescription.  Mr. Cody then alleges Dr. Ott refused to see him again because
"there was nothing she could do for him."

Arrangements were then made for Mr. Cody to see an outside
ophthalmologist, Dr. Michael Griess, on March 28, 2014.  Dr. Griess diagnosed
some type of corneal dystrophy and, Mr. Cody alleges, told Mr. Cody that only
an incompetent professional could have missed this diagnosis.  Dr. Griess then
performed a surgical procedure on both of Mr. Cody's eyes and another doctor,
Dr. Jonathan Erickson, performed two additional operations to replace the
cataract lens in each of Mr. Cody's eyes.  The results of these procedures
produced nearly 20/20 vision in both of Mr. Cody's eyes he alleges.

On October 10, 2017, Dr. Erickson prescribed correctional lenses for
glasses for Mr. Cody.  However, Dr. Ott then performed her own examination of
Mr. Cody's vision and ordered prescription lenses of her own specification.
When the glasses Dr. Ott ordered arrived, Mr. Cody alleges they were not the
right prescription for him and he had difficulties seeing.

---

[5] Mr. Cody writes it was June, 2014, but subsequent descriptions in his
amended complaint make it clear the date was June, 2013.

Mr. Cody filed a grievance about the "delay" in receiving the new glasses Dr. Erickson had prescribed. The court infers from this that Mr. Cody did in fact receive those glasses. Mr. Cody alleges Dr. Erickson performed a cataract surgery on Mr. Cody's right eye on July 23, 2018, and did follow-up exams on July 24 and August 7.[6] Dr. Erickson told Mr. Cody he wanted to do one more follow-up exam about a month later so as to allow the swelling to completely abate and to prescribe new glasses for Mr. Cody.

Dr. Ott then examined Mr. Cody on August 24, 2018, and thereafter canceled Mr. Cody's appointment with Dr. Erickson because Dr. Ott determined Mr. Cody's right eye was "fine." She then ordered prescription glasses for Mr. Cody. After Mr. Cody complained of this matter, defendant Schreurs rescheduled Mr. Cody's appointment with Dr. Erickson. Dr. Erickson did then examine Mr. Cody on September 10, 2018, and prescribed glasses for him. Mr. Cody then received prescription glasses according to Dr. Ott's August prescription, not Dr. Erickson's September prescription. Mr. Cody complained of this to prison officials, noting there was a significant discrepancy between Dr. Ott's prescription and Dr. Erickson's and that the glasses prescribed by Dr. Ott were not adequate for distance vision.

Prison officials provided another pair of glasses to Mr. Cody, again prescribed by Dr. Ott, on November 2, 2018. Mr. Cody asserts these, too, were

---

[6] The first reference to Dr. Erickson performing cataract surgery on Mr. Cody's eyes is undated. The reference to the surgery on the right eye is dated. It is unclear whether these are referring to the same surgery, or whether there were three cataract surgeries.

inadequate for distance vision and he returned them to prison health services on November 4.

Mr. Cody then submitted a grievance asking that his annual eye exam be conducted only by Dr. Erickson and that Dr. Ott not be allowed to treat him further.  Prison officials did schedule Mr. Cody's annual exam with Dr. Erickson, but denied that portion of his grievance asking that Dr. Ott be prohibited from treating him further.

The statute of limitations for § 1983 claims is three years.  See SDCL § 15-2-15.2; Wilson, 471 U.S. at 266-67.  Clearly, the treatment issues Mr. Cody alleges occurred in 2013 and 2014 are outside the statute of limitations period.  The court recommends that these claims be dismissed.

As to the claims involving Dr. Ott's allegedly poor treatment of Mr. Cody, the court recommends these claims be dismissed as well.  Prison officials scheduled appointments for Mr. Cody's eye care with outside specialists, ensured he received a number of surgeries for his eyes, and provided eyeglasses in accord with the outside specialist's prescription.  The only complaints Mr. Cody made that were unsatisfied were his request that he not ever have to see Dr. Ott again, which does not fall within the Eighth Amendment because it has not been alleged Dr. Ott is chronically deliberately indifferent.  Instead, Dr. Cody's allegations amount only to an assertion that she is negligent or that she and Dr. Erickson have a difference of opinion. Allard, 779 F.3d at 772 (misdiagnosis does not constitute deliberate indifference; inmate must show or allege criminal recklessness).  A mere

21

disagreement with treatment also does not rise to the level of unconstitutional conduct. Id. at 773.

The other complaint Mr. Cody asserts was not satisfied was the delay in receiving prescription eyeglasses. But delay in treatment alone does not create a deliberate indifference claim unless a worsening of one's condition was experienced as a result of the delay. Jackson v. Riebold, 815 F.3d 1114, 1120, 1120 n.4 (8th Cir. 2016). Mr. Cody makes no such allegation with regard to the delay in receiving eyeglasses. The court recommends that Mr. Cody's Eighth Amendment claims related to eye care be dismissed from his amended complaint because they do not state a claim for relief.

### c.    anemia

Mr. Cody alleges the kosher diet he is given (he makes no allegation that his religious beliefs require a kosher diet), contains insufficient iron and, as a result, he developed anemia. Mr. Cody alleges Dr. Regier prescribed 325 milligrams of ferrous sulfate (iron) to compensate for the iron missing in Mr. Cody's diet.

Dr. Regier then consulted with a hematologist specializing in the diagnosis and treatment of anemia. Based on the specialist's recommendation, Mr. Cody alleges Dr. Regier increased his prescription to three (3) 325-milligram tablets of ferrous sulfate daily. Mr. Cody alleges this caused him constipation and so Mr. Cody, acting on his own, reduced his consumption to two iron tablets per day on March 28, 2018. Then, his constipation not

abating, Mr. Cody again acting alone reduced his consumption back to the original one tablet per day.

On May 18, 2018, Mr. Cody again saw Dr. Regier and a blood test showed Mr. Cody's anemia had increased. Mr. Cody explained the problem he had experienced with constipation. Dr. Regier then prescribed 625 milligrams of fiber-lax per day to compensate. Mr. Cody informed Dr. Regier he had been reading a college nutrition text and believed a better approach would be for CBM food services (the entity which provides food to SDSP via contract with the DOC), to provide him with one cup of beans per day to supplement his diet. Dr. Regier did not order a one-cup-of-beans per day diet and CBM has refused to provide one. Grievances filed by Mr. Cody were unavailing.

These facts--taken as true as alleged by Mr. Cody--do not state a deliberate indifference claim. Mere differences of opinion between an inmate and medical service providers does not constitute deliberate indifference. Allard, 779 F.3d at 773. Providing iron tablets and, when constipation ensues, prescribing fiber laxative, does not evince a criminally reckless state of mind. Id. at 772-73. The court recommends Mr. Cody's deliberate indifference claim based on treatment of his anemia be dismissed as not surviving screening.

### d.    requiring inmates to purchase OTC medical items

Mr. Cody alleges the defendants instituted a policy whereby OTC items that he used to receive from health services such as eye drops, skin cream, antacids, special toothpaste, cough drops, some pain meds, and soaps which are deemed medically necessary now must be purchased through the

23

commissary.  Mr. Cody alleges he is indigent and that this constitutes deliberate indifference to his serious medical needs.

Mr. Cody does not identify all of his medical conditions associated with each of the above OTC items, but he does identify some.  For example, he states he has Type II diabetes, which requires him to use skin creams to prevent lesions.  He states he is unable to breathe through his nose, which causes his mouth to be dry and makes him cough, for which he needs cough drops.  The court assumes, for purposes of screening, that Mr. Cody's medical conditions are of a level of seriousness sufficient to satisfy Eighth Amendment standards.

Although states have an obligation to provide medical care to their prisoners, the Constitution does not dictate how the cost of that care is to be allocated.  Estelle, 429 U.S. at 103; City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 245 (1983).  A key question is whether medical treatment is withheld *until* the inmate can pay the required sum, or whether the inmate is allowed to receive treatment when needed and must pay subsequent to the treatment.  Englehart v. Dasovick, 12 F.3d 1102 (Table) (8th Cir. Dec. 7, 1993); Mayo v. Norris, 2009 WL 2136291 at *2 (E.D. Ark. July 13, 2009).  So long as the prisoner is not deprived of necessary care, there is no constitutional violation in a state's requiring inmates to pay for that care.  Mayo, 2009 WL 2136291 at *2 (citing numerous cases).

Cases in this circuit have held that charging indigent inmates for hygiene products and OTC products is constitutionally permissible so long as the

24

inmate is not deprived of medical care due to inability to pay. <u>Myers v. Hundley</u>, 101 F.3d 542, 544 (8th Cir. 1996); <u>Brown v. Hickman</u>, 2011 WL 4368393 at *3 (W.D. Ark. Aug. 25, 2011). Permissible schemes include allowing an inmate to receive care at the time it is needed and requiring him to pay for that care after the fact. <u>Id.</u>

Nowhere in Mr. Cody's voluminous amended complaint does he ever allege he was denied access to OTC items because he was unable to pay for them from the commissary. In fact, there is a direct inference that can be drawn to the contrary when Mr. Cody states he should not have to "pay *or be in debt for*" OTC items which are medically necessary. <u>See</u> Docket No. 9 at p. 44, ¶145. In addition, Mr. Cody states that defendants denied his grievance on the topic of having to pay for OTC items on the basis that he was never at any time denied medical care. <u>Id.</u> at p. 45, ¶146. Accordingly, this court recommends his Eighth Amendment deliberate indifference claim based on his having to purchase OTC items from the commissary be dismissed both because Mr. Cody never alleges he was denied medical care and because it appears he was in fact never denied medical care.

### 2.    Access to the Courts

In addition to invoking the Eighth Amendment, Mr. Cody alleges his First Amendment right to access the courts was violated by defendants when they allegedly denied him competent and adequate eye care. Again, the court ignores those allegations outside the three-year statute of limitations and focuses instead on the allegations occurring within three years of the date

25

Mr. Cody filed his complaint with this court.  The standard for an access to the courts claim is the same as recited above.

Mr. Cody never alleges facts from which the court can infer any actual injury occurred as a result of his allegedly incompetent and inadequate eye care.  Mr. Cody never identifies a nonfrivolous legal claim that was frustrated or impeded by defendants' failure to provide what he considers to be adequate eye care.  The court notes that Mr. Cody is a very experienced, knowledgeable and articulate litigator in federal court, having filed 24 lawsuits with the court. In addition, in his 2014 case he asserted an access to the courts claim and the court explained at length the legal requirements for such a claim, including the requirement of alleging an actual injury.  See Cody v. McDonald, 4:14-cv-04155-RAL, Docket No. 31 at pp. 10-15 (D.S.D. July 1, 2015).  Accordingly, the court recommends Mr. Cody's access to the courts allegation in Claim No. 4 be dismissed on screening for failing to articulate or allege facts from which it might be inferred that he suffered an actual injury.

### 3.    Due Process

Mr. Cody asserts having to pay for OTC items which are medically necessary violates his due process rights.  He never identifies whether he is alleging a violation of his substantive due process rights or his procedural due process rights.  He never alleges any facts from which the court can discern an impact on due process rights.  Accordingly, the court recommends Mr. Cody's due process allegation in Claim No. 6 be dismissed on screening.

E.    **Claim 7—Access to Medical Reference Materials**

Mr. Cody alleges he needs to know what medical terms in his medical records mean in order to understand those terms and to prepare legal claims based upon the content of a medical record.  He alleges the SDSP has a 2006 edition of the Physician's Desk Reference (PDR) that is outdated and is missing many pages that have been torn out.  Mr. Cody asserts defendants placed a Dorland's Illustrated Medical Dictionary (32d ed. 2012), in the prison library in response to his complaints.  However, he asserts he cannot find all the medical information in this reference book which he needs.  He asserts he needs access to a medical encyclopedia or similar medical reference in order to properly be able to present deliberate indifference claims.

The same legal standard recited above applies here.  The court again notes that Mr. Cody never identifies an actual injury.  He never asserts that there was a nonfrivolous claim he was unable to bring to this court because of the absence of a medical encyclopedia.  The very conclusion this court has reached that Mr. Cody has presented at least some medical claims that survive screening leads to the opposite conclusion.  At this stage, Mr. Cody needs only to *articulate* a legal claim that was frustrated or impeded by the lack of a medical reference book.  He has not even made that allegation.  Accordingly, the court recommends the access to the courts allegation contained in Claim No. 7 be dismissed on screening.

**F.    Claims 9 & 10—Retaliation**

Mr. Cody alleges that defendants accused him of helping a fellow inmate, James Shaw, with Mr. Shaw's federal civil rights claim. Mr. Cody also alleges defendants retaliated against him for filing grievances. Mr. Cody alleges defendants threatened him for giving assistance to Mr. Shaw, took away his prison job, placed him temporarily in the special housing unit ("SHU"), and then took his property from his cell, including his legal papers, some of which he alleges were never returned. Mr. Cody alleges this violated his right of access to the courts and his due process rights.

**1.    Access to the Courts**

Although it is far from clear, giving the most generous reading to Mr. Cody's claim, the court understands him to be saying that he was retaliated against in violation of his First Amendment rights and that he was compiling evidence of that retaliation. Then, defendants Bieber and others stole all his paperwork from his cell which documented the retaliation. Thus, Mr. Cody asserts not an outright claim of retaliation. Rather, that defendants' actions in taking his evidence deprived him of his ability to bring a retaliation claim. Hence, instead of alleging a retaliation claim, Mr. Cody alleges defendants' actions have deprived him of access to the courts to bring a nonfrivolous legal claim—the retaliation claim.

Unlike his other access to the courts claims, Mr. Cody herein identifies an "actual injury." He alleges he was compiling evidence, both legal and factual, for a retaliation claim against defendant Bieber. This included a

28

number of 3 x 5" cards filed chronologically behind a tab called "Retal. X
Bieber) (Retaliation by UM Bieber) that defendants took and never returned.
The cards contained notes of events Mr. Cody believed supported a retaliation
claim against Bieber.  In addition, Mr. Cody claims he had notes of witnesses
for this claim and lists of discovery to request, all of which were taken.

The court finds, at this stage of review, that Mr. Cody's asserted
retaliation claim was a nonfrivolous claim.  "A prisoner's Eighth Amendment
rights are violated if prison officials 'impose a disciplinary sanction against a
prisoner in retaliation for the prisoner's exercise of his constitutional right.' "
Meuir v. Greene County Jail Employees, 487 F.3d 1115, 1119 (8th Cir. 2007).
See also Haynes v. Stephenson, 588 F.3d 1152, 1155 (8th Cir. 2009).  A *prima
facie* case of retaliatory discipline requires a plaintiff to show (1) that he
exercised a constitutionally protected right, (2) that he was subsequently
disciplined by prison officials, and (3) the motive for imposing the discipline
was the exercise of the constitutional right.  Id.

To prevail on a claim of retaliation for violation of a First Amendment
right, the plaintiff must show (1) that he engaged in a protected activity,
(2) that the government defendant took adverse action against the plaintiff that
would chill a person of ordinary firmness from continuing in the activity; and
(3) that the adverse action was motivated at least in part by the exercise of the
protected activity.  Santiago v. Blair, 707 F.3d 984, 991 (8th Cir. 2013).

The third element of the *prima facie* case requires the plaintiff to show
that, "but for" the retaliatory motive, the disciplinary action would not have

29

been taken.  Haynes, 588 F.3d at 1156.  The "but for" test applies to the defendants' motive, not to causation.  Beaulieu v. Ludeman, 690 F.3d 1017, 1025 (8th Cir. 2012).  If, as Mr. Cody alleges in his complaint, defendants placed him in the SHU for no valid reason for the purpose of ransacking his cell and removing his notes and papers documenting retaliation actions defendants had perpetrated against him, Mr. Cody has at least identified a set of facts that could potentially have supported a retaliation claim.

Here, the retaliation claim is the alleged "actual injury" (the nonfrivolous legal claim that was frustrated by defendants' actions) in support of the denial of access to the courts claim resulting from defendants taking his legal property.  Mr. Cody asserts he could have brought a nonfrivolous claim of retaliation against Bieber and those who assisted Bieber; their act of taking his notes and papers frustrated or impeded the bringing of such a suit.  The court concludes Mr. Cody has alleged sufficient facts to support this access to the courts claim in Claims No. 9 and 10 and recommends the claims be allowed to go forward.

### 2.    Due Process

Mr. Cody alleges the normal procedure when prison officials remove an inmate's possessions from his cell is to make an inventory of the items removed, box them up, then later return the non-contraband items to the inmate with a list of items retained that are considered contraband.  Mr. Cody alleges defendants failed to follow their own policy in this regard when they removed his personal property and legal papers from his cell.  A prison official's

failure to follow internal prison policy does not state a constitutional claim.

<u>Williams v. Nix</u>, 1 F.3d 712, 717 (8th Cir. 1992) (stating the "mere violation" of

a prison regulation "does not constitute a federal due process violation.").

As to a due process claim, the Supreme Court in <u>Hudson v. Palmer</u>, 468

U.S. 517, 533 (1984), held if there is an adequate postdeprivation remedy, then

there is no due process violation for even the intentional deprivation of a

prisoner's property.  Because state law provided the prisoner in <u>Hudson</u> with

adequate state remedies after the deprivation of his property, the Court held

that no due process violation occurred in that case.  <u>Id.</u> at 535.

Here, SDCL § 21-3-3 provides an adequate postdeprivation remedy.  That

statute provides as follows:

> The detriment caused by the wrongful conversion of personal
> property is presumed to be:
>
> (1) the value of the property at the time of the conversion, with
> interest from that time;
>
> (2) where the action has been prosecuted with reasonable
> diligence, the highest market value of the property at any time
> between the conversion and the verdict, without interest, at the
> option of the injured party;
>
> (3) a fair compensation for the time and money property expended
> in pursuit of the property.
>
> Such presumptions cannot be repelled in favor of one whose
> possession was wrongful from the beginning by his subsequent
> application of the property to the benefit of the owner, without his
> consent.

<u>See</u> SDCL § 21-3-3.

Section 21-3-3 provides a description of the damages available for conversion, but the tort of conversion is a common law tort not defined in the statute.  Rensch v. Riddle's Diamonds of Rapid City, Inc., 393 N.W.2d 269, 271 (S.D. 1986).  Conversion "rests upon the unwarranted interference by defendant with the dominion over the property of the plaintiff from which injury to the latter results."  See Fin-Ag., Inc. v. Pipestone Livestock Auction Market, Inc., 2008 S.D. 48, ¶ 41, 754 N.W.2d 29, 46.  "Conversion is the unauthorized exercise of control or dominion over personal property in a way that repudiates an owner's right in the property or in a manner inconsistent with such right."  Chem-Age Indus., Inc. v. Glover, 2002 S.D. 122, ¶ 20, 652 N.W.2d 756, 766.  "Intent or purpose to do a wrong is not a necessary element of proof to establish conversion."  Id. (quoting Rensch, 393 N.W.2d at 271).

The common law and SDCL § 21-3-3 provide Mr. Cody with an adequate postdeprivation remedy for the conversion of his property.  Accordingly, there is no due process violation.  Hudson, 468 U.S. at 535.  The court therefore recommends that Mr. Cody's due process claims contained in Claims No. 9 and 10 be dismissed.

## G.    Defendants Who Should Not Be Served

If the district court adopts this court's recommendations as to which claims in Mr. Cody's amended complaint should be dismissed and which should be allowed to go forward, there are some defendants who should be dismissed.  Some defendants are named solely in counts which this court is recommending be dismissed.  Also, some defendants are named solely in a

supervisory capacity with insufficient allegations made to establish even a facially plausible case for liability.

### 1. defendants named only in claims recommended for dismissal

Defendants Dr. Kendra Ott, Jessica Becker, Merlin Sejnoha, Jr., and CMB Managed Services are defendants who are named only in claims this court recommends be dismissed. Those are Claims No. 4, 5, and 6. If the district court dismisses those three claims, Ott, Becker, Sejnoha and CBM should be dropped from the caption and should not be served with Mr. Cody's amended complaint.

### 2. defendants about whom insufficient allegations are made

Mr. Cody alleges defendant Dr. Mary Carpenter, is liable because she "allowed" DOC employees to seize Mr. Cody's mail from outside medical providers. Likewise, defendants Darin Young, the Warden at SDSP, and Denny Kaemingk are alleged by Mr. Cody to have "allowed" this mail interference. Likewise, Mr. Cody alleges Dr. Carpenter "allowed" others to deny Mr. Cody hearing aids. Finally, Warden Young is alleged to have "allowed" other defendants to have retaliated against Mr. Cody by taking his property from his cell.

"Failure to process or investigate grievances, without more, is not actionable under § 1983." Thomas v. Banks, 584 Fed. Appx. 291 (8th Cir. 2014); Harris v. Caruso, 465 Fed. Appx. 481, 487 (6th Cir. 2012). Thomas does not foreclose the possibility that a supervisor's involvement by virtue of

responding to a grievance, in addition to other facts, might subject him or her to liability in an individual capacity.  But there must be something more.

"[M]ere negligence in failing to detect and prevent a subordinate's conduct is not enough for liability under Section 1983.  'The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he] might see.' " Ripson v. Alles, 21 F.3d 805, 809 (8th Cir. 1994).  "[A] supervisor may be held individually liable . . . if he directly participates in a constitutional violation or if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." Andres v. Fowler, 98 F.3d 1069, 1078 (8th Cir. 1996).  The supervisor must tacitly authorize or show deliberate indifference to the offending acts.  Id.  The plaintiff must show the supervisor had notice that the subordinate's training and supervision "were inadequate and likely to result in a constitutional violation." Id.

Reading Mr. Cody's amended complaint allegations in context, and giving him the benefit of liberal construction, he has failed to allege plausible facts from which it might be inferred that a colorable basis of supervisory liability exists against either Warden Young, Secretary Kaemingk, or Dr. Carpenter. The facts alleged establish merely that they are the head of the chain of command of either the correctional health system, the corrections system, or the SDSP.  The facts alleged by Mr. Cody, even if true, are insufficient to establish supervisory liability for these three defendants.  In addition, Dennis Kaemingk stepped down as Secretary of the South Dakota Department of

34

Corrections on January 13, 2019. Mike Leidholt assumed that position on January 14, 2019. Mr. Cody filed his lawsuit on February 5, 2019. For all these reasons, the court recommends that defendants Carpenter, Young and Kaemingk be dismissed on screening and that none of these three defendants be served with Mr. Cody's complaint or a summons.

## CONCLUSION

The undersigned has screened Mr. Cody's amended complaint (Docket No. 9) and recommends that the following claims and defendants be DISMISSED:

1.      that all equal protection claims be dismissed (subparts of Claims 1-2, 6, 9 & 10);

2.      that all subparts of Claims 1, 2 and 8 be dismissed except the First Amendment interference with mail claim;

3.      that the entirety of Claims 4, 5, 6, and 7 be dismissed;

4.      that the due process subpart of Claims 9 and 10 be dismissed; and

5.      that defendants Dr. Kendra Ott, Jessica Becker, Merlin Sejnoha, Jr., CBM Managed Services; Dr. Mary Carpenter; Darrin Young, and Dennis Kaemingk be dismissed.

The undersigned further respectfully recommends that the following claims be ALLOWED to proceed:

A.      that the First Amendment interference with mail subpart of Claims 1, 2 and 8 be allowed to go forward;

B.      that Claim 3 be allowed to go forward in its entirety; and

C.      that the access to the courts subpart of Claims 9 and 10 be allowed to go forward.

Defendants who are named in the allowed claims and for whom this court recommends summonses be issued are:

| | |
|---|---|
| RN Heather Bowers | Linda Miller-Hunhoff |
| RN Jessica Schreurs | Kristine Wiersma |
| RN Kayla Tinker | Steve Baker |
| Arthur Allcock | Jennifer Drieske |
| Troy Ponto | Derrick Bieber |
| Elizabeth Effling | CO Gaikowski |
| Brent McDonald | |

Each of the above being sued in their individual as well as official capacities.

## NOTICE OF RIGHT TO APPEAL

Mr. Cody, as the only party of record at this point in the proceedings, is hereby notified he has fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  See FED. R. CIV. P. 72; 28 U.S.C. § 636(b)(1)(B).  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Id.  Objections must be timely and specific in order to require *de novo* review by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED June 28, 2019.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge

36